Allowed.

May 1, 2026

*[signature]*
U.S.M.J.

## AFFIDAVIT OF TASK FORCE OFFICER JEFFREY BROWN

I, Task Force Officer Jeffrey Brown, Drug Enforcement Administration, being duly sworn, depose and state as follows:

### Agent Background

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I am a Detective Sergeant with the Middleborough Police Department, where I have been employed since 2012. In addition, since 2018, I have been assigned to the Financial Investigations Team of the New England Field Division of the Drug Enforcement Administration ("DEA") as a Task Force Officer. I am a graduate of the MBTA Transit Police Academy.

3.      As a Middleborough Police Detective and DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the police academy and have attended additional specialized training courses in furtherance of my past and current assignments, including the Basic Narcotic Investigation course conducted and presented by the DEA training staff.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are

imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     Based on my training and experience, I am familiar with the manner and means commonly employed by drug traffickers, weapons traffickers, and money launderers, including those employed to avoid detection by law enforcement. I am familiar with how drug traffickers often store drugs, weapons, and drug proceeds in storage sites commonly referred to as "stash houses," as well as various methods used to conceal and transport these items. I am also familiar with the terminology, slang, and coded language commonly employed by these individuals. I am aware of the prices commonly charged for various illegal narcotics and illegal weapons, the method of packaging, and the jargon used in their trade. I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities. Similarly, I am familiar with investigations regarding closely associated illegal activities commonly engaged in by drug trafficking organizations, especially the laundering of drug proceeds.

### Purpose of Affidavit

6.     I submit this affidavit in support of a criminal complaint charging Armando GALLO ("GALLO") for conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.

## PROBABLE CAUSE

### Background

7.      In July 2023, a confidential source ("CS")[1] working with DEA identified GALLO, known to CS as "El Gallo," as an individual involved in trafficking fentanyl, cocaine, and methamphetamine, and who claimed to be affiliated with the Jalisco New Generation Cartel ("CJNG") in Mexico.  CS identified GALLO based on a booking photograph from a 2021 arrest in California.  CS provided two telephone numbers for GALLO and explained that GALLO communicates with CS via Facetime calls and has shown and offered to sell narcotics to CS.

8.      In March 2024, GALLO asked CS for an address at which GALLO could send a sample of narcotics.  At the direction of investigators, CS provided a P.O. Box address in Massachusetts.  Investigators determined that the package originally sent by GALLO on March 22, 2024, was returned to sender and never delivered to CS because GALLO neglected to put a recipient's name on the package.

9.      In April 2024, GALLO again offered to send CS a free sample of pressed fentanyl pills and crystal methamphetamine.  At the direction of investigators, CS provided an address (this time in Rhode Island) for GALLO to send the samples. On May 30, 2024, GALLO contacted the CS and informed CS that he shipped the sample and provided the tracking information for the package.  Inspectors with the U.S. Postal Service confirmed that the package had been shipped from Hesperia, California on May 20, 2024.  On June 1, 2024, investigators intercepted the package intended for CS and opened the package.  Inside, investigators found a Hot Wheels toy

---

[1] CS is cooperating with investigators in hopes of receiving leniency in sentencing after pleading guilty to a federal drug offense.  CS has a criminal history that includes other drug trafficking and assault and battery charges as well.  The information provided by CS has been corroborated to the extent possible and information provided by CS is believed to be reliable.

box which further concealed a $5 bill which contained a crystal-like substance believed to be crystal methamphetamine, as well as a white paper receipt containing 8 blue pills suspected to contain fentanyl.  The DEA laboratory confirmed that this package contained .11 grams of 99% pure methamphetamine and .85 grams of fentanyl in the pills.

10.   Throughout the remainder of 2024 and into 2025, GALLO continued to offer to sell narcotics to CS and routinely updated his contact information whenever he changed telephone numbers.  In May 2025, GALLO informed CS that his current contact number was 626-680-9261 (the "9261 Number").

11.   In the fall of 2025, CS met with an undercover agent ("UC") and together they called GALLO on speakerphone so that all three could speak.  This call was recorded.  CS introduced UC as a local trafficker in Boston who was looking for a supplier for cheap pills (referring to fentanyl pills).  GALLO agreed to have CS pass GALLO's contact information to UC and, in September 2025, UC sent a WhatsApp message to GALLO at his 9621 Number.  UC introduced himself as "Lucho from Boston," and reiterated that was looking to receive a sample of pills from GALLO.  GALLO agreed to send a free sample of pills and asked UC for an address to send the pills.  On September 7, 2025, UC sent GALLO an address in Framingham, Massachusetts to receive the pills.  GALLO did not send those pills because he was reluctant to send the pills through the mail.  Instead, throughout the rest of 2025, GALLO and UC continued to discuss/negotiate this transaction and GALLO encouraged UC to travel out to California to retrieve the drugs. During these discussions, GALLO initially discussed that he would only sell a minimum of 10,000 pills but later agreed to sell 2,500 at a time.

4

<u>January 7, 2026—GALLO Sold ~2,500 Suspected Fentanyl Pills to UC</u>

12.     On January 5, 2026, UC informed GALLO that he had an associate in California (actually another undercover officer in California, "UC-2") who could meet GALLO to retrieve the drugs and would arrange for them to be transported back to UC in Boston.   They agreed on 2,500 pills for a price of $2,500 and agreed that GALLO would send an associate to deliver the pills to UC-2 on January 7, 2026, in Hesperia, California.

13.     On January 7, 2026, at approximately 1:48 p.m., GALLO sent UC a WhatsApp message asking what UC-2's estimated time of arrival was.  UC advised that UC-2 would arrive at approximately 2:15 p.m.  At approximately 2:14 p.m., GALLO told UC that his runner was in an "old Gray Hyundai."  Shortly thereafter, UC-2 arrived at the proposed meeting location in an undercover vehicle equipped with audio recording equipment.  UC-2 and surveillance officers noticed an older model gray Hyundai in the same parking lot.  At that point, an unidentified Hispanic male ("UM") exited the Hyundai and entered the front passenger seat of UC-2's vehicle. UM handed UC-2 three baggies containing blue pills marked with "M-30" in exchange for $2,500 in official funds.  UM asked for a ride home from UC-2 because UM had locked his keys in his car, but when UC-2 declined, UM exited the undercover vehicle.   UC-2 travelled to meet other investigators where he relinquished the suspected fentanyl pills.  The pills were sent to the DEA laboratory for analysis, which confirmed that there were approximately 1930 pills which weighed a total of 216.8 grams and contained fentanyl.  Based on my training and experience and the discussions between GALLO and UC leading up to this transaction, I believe the pills containing fentanyl were made to look like pharmaceutical-grade oxycodone pills.

14.     At 5:22 p.m. that evening, GALLO called UC to confirm the deal was complete and that UC-2 had the sample pills.

15.     At 6:25 p.m. that evening, GALLO informed UC that the sample was apparently 400 pills short.  GALLO and UC then discussed how they could reconcile the transaction. When UC suggested that GALLO could mail the remaining 400 pills, GALLO said he did not like sending packages through the mail because "people f*ck around with the packages at the post office."  GALLO told UC he would see if someone else would mail the 400 pills, or otherwise suggested that GALLO could give the UC the remaining pills in a future transaction.

16.     On January 19, 2026, UC called GALLO via WhatsApp at the 9621 Number and told him that UC had received the sample GALLO had delivered to UC-2 in California and that UC wanted to grab a "package" (referring to purchasing a larger quantity of 10,000 fentanyl pills) from GALLO.  Over the course of several days, GALLO and UC negotiated the quantity and pricing for the next transaction.  UC also indicated that he was interested in purchasing a larger quantity in March 2026.

17.     Based on the above, I believe GALLO arranged to have UM deliver 216.8 grams of fentanyl pills to UC-2, with the understanding that the pills would be delivered to UC in Massachusetts.

### February 2, 2026—GALLO Sold ~10,000 Suspected Fentanyl Pills to UC

18.     On February 2, 2026, UC contacted GALLO via WhatsApp at the 9261 Number to discuss the further purchase of fentanyl pills.  They agreed to conduct the exchange later that day, between 1:00 and 2:00 p.m. for UC-2 to obtain 10,000 pills in exchange for $7,500 on behalf of UC.  GALLO and UC ultimately agreed to conduct the transaction in the same location as the January 7 transaction, in Hesperia, California.  GALLO told UC that he would be sending the same person in the same vehicle as the prior transaction on January 7.

19.     Equipped with an audio-recording device, UC-2 traveled in an undercover vehicle to the meeting location at approximately 1:45 p.m.   Shortly thereafter, investigators conducting surveillance observed the same older model gray Hyundai parked nearby.

20.     At approximately 2:00 p.m., investigators observed the Hyundai park next to the UC vehicle.  Investigators observed UM exit the driver's seat on the Hyundai carrying a black bag, and walk into the front passenger seat of the UC vehicle.  Inside, UM provided UC-2 with the black bag which contained a cellophane wrapped bundle containing numerous blue pills marked M-30, in exchange for $7,500 in official funds.  UM then retrieved the black bag and exited the UC vehicle, re-entered the Hyundai, and drove off.

21.     UC-2 travelled to meet other investigators where he relinquished the suspected fentanyl pills.  The pills were sent to the DEA laboratory for analysis, which confirmed that there were approximately 9000 pills which weighed a total of 1022.4 grams and contained fentanyl

22.     At approximately 6:36 p.m., GALLO informed UC that UC-2 picked up the fentanyl pills.  On February 5, 2026, UC thanked GALLO and confirmed that he was still interested in making the larger purchase the following month.

23.     Based on the above, I believe GALLO coordinated to have UM deliver 1022.4 grams of fentanyl in pills, with the understanding that the pills would be brought by UC back to Massachusetts.

Ongoing Communications with GALLO

24.      Following the February 2, 2026, delivery of over 1 kilogram of fentanyl in pill form from GALLO via his runner, UC and GALLO have continued to negotiate the purchase of 100,000 pills in March or April 2026.  When UC asked of GALLO would accept $0.75 per pill, GALLO said he would need to check with his associates because the Mexican supply chain was

7

still messed up following the murder of the leader of CJNG cartel. Later that day, GALLO confirmed that his associates were still able to get the pills through from Mexico and that they would be charging $0.80 a pill, but would include 10,100 pills for the price of 10,000.

25.    On March 24, 2026, UC conducted an audio and video recorded WhatsApp call with GALLO on the 9621 Number. During this video call, UC positively identified GALLO as the caller and user of the 9621 Number based on GALLO's booking photo. During the call, the two discussed timing for the future transaction. The following day, UC confirmed that his associate, UC-2, would be available to pick up the 100,000 pills the week of April 20, 2026.

26.    Since then, GALLO and UC have continued to discuss this transaction and have agreed for it to take place on May 4.

### CONCLUSION

27.    Based on the above, there is probable cause to believe that GALLO conspired to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846

Respectfully submitted,

_Jeffrey Brown (JDH)_
Jeffrey Brown
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn via telephone in accordance with Fed. R. Crim. P. 4.1 on May 1, 2026.

HON. JESSICA D. HEDGES
UNITED STATES MAGISTRATE JUDGE

8